IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

UNITED STATES OF AMERICA     )
                             )    CRIMINAL ACTION NO.
     v.                      )       2:17cr38-MHT
                             )          (WO)
EUNISES LLORCA-MENESES       )

### OPINION AND ORDER

This criminal case is currently before the court on two motions for a new trial made by defendant Eunices Llorca-Meneses.  In her first, she argues that the "interest of justice," Fed. R. Crim. P. 33(a), requires a new trial because inculpatory testimony was improperly admitted at trial.  As ground for her second, she argues that newly discovered evidence warrants a new trial.  For reasons that follow, the first motion will be granted, albeit not for all the reasons advanced, and the second one denied.

### I.  Procedural History

*February 9, 2017*: Llorca-Meneses and codefendant Reinier Perez-Rives were charged in a five-count

indictment with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, two counts of aiding and abetting aggravated identity theft in violation of 18 U.S.C. §§ 1343 and 2, and two counts of aiding and abetting aggravated identity theft in violation of 18 U.S.C. §§ 1028A and 2.

July 27: Perez-Rives pled guilty pursuant to a plea agreement.

*September 8*: A jury found Llorca-Meneses guilty of all five charges.

*September 18*: Llorca-Meneses filed a motion seeking an extension of time to file a motion for a new trial. The government did not object, the extension motion was granted, and she was given until October 13.

*October 11*: Prior to the expiration of the first extension, Llorca-Meneses moved for a second extension based in part on defense counsel's inability to reach her following Hurricane Irma. The government did not object, the court granted the second extension motion, and Llorca-Meneses was given until October 27.

*October 27*:  Llorca-Meneses filed her first motion for a new trial, which was then later briefed by the government.

*January 25, 2018*:  After her first motion for new trial had been briefed and was under submission, Llorca-Meneses orally sought leave to file a second motion for new trial, this time based on newly discovered evidence.  The government did not object.

*January 26:*  The court granted the January 25 oral motion, and gave Llorca-Meneses until February 8 to file a "new or amended" motion for a new trial.  Briefing Order (doc. no. 118).

*February 9*: Llorca-Meneses filed a "First Amended Motion for New Trial," which was then later briefed by the government.  (Due to defense counsel's lack of familiarity with filing documents under seal, the amended motion, although due on February 8, was not docketed until February 9.)

*July 10:*  Because of the seriousness of the matter presented, up through July 10 the court obtained and

received transcripts of various parts of the trial to rely upon in its ruling.

## II. Timeliness of Motions for New Trial

The court must first determine whether Llorca-Meneses's motions for new trial were timely filed. Motions for new trial are governed by Federal Rule of Criminal Procedure 33, which states: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33(b) divides motions for new trial into two general categories: those based on newly discovered evidence and those based on all other grounds. While defendants have three years after the verdict to file motions based on newly discovered evidence, *see* Fed. R. Crim. P. 33(b)(1), motions based on all other grounds must be filed within 14 days of the verdict. *See* Fed. R. Crim. P. 33(b)(2).

Before the court are two interest-of-justice motions, one based on newly discovered evidence, and the

other based on 'another ground.'  Llorca-Meneses's first motion for new trial is based on another ground, and, thus, is a Rule 33(b)(2) motion subject to a 14-day limitation.  As the court granted extensions of time before the allowed time periods had elapsed, the motion was timely. *See* Fed. R. Crim. P. 45(b)(1) ("When an act must be done within a specific period, the court may extend the time either (A) before the originally prescribed or previously extended time expires....").  The second motion argues a new trial is warranted due to "newly discovered evidence."  As this was a Rule 33(b)(1) motion, the three-year filing deadline applies, and it was timely.

The government argues that, because the second motion was labelled an "amended" motion and did not expressly incorporate the first motion, Llorca-Meneses abandoned the ground for her first motion.  As support for this assertion, the government relies on the rule from the civil context that "an amended pleading supersedes the former pleading," and thus "the original pleading is

abandoned by the amendments, and is no longer part of the pleader's averments against his adversary." *Pintando v. Miami-Dade Housing Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007).

The court is not persuaded by this argument. Aside from the fact that this is a criminal case, not a civil one, a motion for new trial is not a pleading even in the civil context. *See* PLEADING, Black's Law Dictionary (10th ed. 2014) ("A formal document in which a party to a legal proceeding (esp. a civil lawsuit) sets forth or responds to allegations, claims, denials, or defenses. In federal civil procedure, the main pleadings are the plaintiff's complaint and the defendant's answer."). While there are good reasons to adopt such a rule in the case of pleadings, such formality is not called for in the case of motions. Moreover, the government has not put forward and the court has not identified any rules of criminal procedure or cases indicating this rule applies to motions for a new trial in the criminal context.

Furthermore, the court will not rely on a label when the substance of the motion clearly seeks independent relief under Rule 33(b)(1). To do so would exalt form over substance, and create a trap for unseasoned litigators. In addition, the court may have unintentionally contributed to counsel's labelling error when, in response to notice of the new evidence, it entered an order to file a "new or amended motion." In light of this history, the court finds it more likely that counsel made an honest mistake than that he intended to abandon his earlier motion by labeling the second motion "amended." Especially given the court's possible contribution to the labelling error, it is unwilling to take the draconian step of holding that Llorca-Meneses abandoned her first motion by implication. Thus, the court finds that both motions are properly before the court for resolution.

### III. Legal Standard

Under Rule 33(b)(2), the court is empowered to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. Outside the context of claimed newly discovered evidence, this standard is broad, and the decision to grant a new trial is within the sound discretion of the trial court, see *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994); the trial court may grant a motion for new trial even where the defect does not constitute reversible error, or even legal error at all. *See id.* at 198-99. Rather, the court "has very broad discretion in deciding in whether there has been a miscarriage of justice." *United States v. Hall*, 854 F.2d 1269, 1271 (11th Cir. 1988). Indeed, the power of a district court to grant a new trial "is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous." *Vicaria*, 12 F.3d at 198-99. In addition, "the cumulative effect of multiple errors may so prejudice a defendant's right to a fair trial that a

new trial is required, even if the errors considered individually are non-reversible." *United States v. Thomas*, 62 F.3d 1332, 1343 (11th Cir. 1995). Llorca-Meneses's first motion, which does not rely on newly discovered evidence, is governed by this standard.

However, defendants seeking a new trial based on newly discovered evidence under Rule 33(b)(1) must satisfy a five-part test: (1) the evidence must be discovered following the trial; (2) the movant must show due diligence to discover the evidence; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material to issues before the court; and (5) the evidence must be of such a nature that a new trial would probably produce a new result. *See United States v. Taohim*, 817 F.3d 1215, 1223 (11th Cir. 2013). Of course, for evidence to be likely to produce a different result, it must be admissible at trial. *See United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003) (affirming the denial of a motion for a new trial because the evidence offered was not admissible under

Fed. R. Evid. 804(b)(3), and, thus, would not have produced a different result at trial). Failure to satisfy any one of the five elements is fatal to a motion for new trial on this basis. *Taohim,* 817 F.3d at 1223. Motions for new trial based on newly discovered evidence are "highly disfavored," and district courts "should use 'great caution' in granting a new trial motion based on newly discovered evidence." *Jernigan,* 341 F.3d 287 (internal quotations omitted). Llorca-Meneses's second motion is governed by this standard.

## IV. Factual Background

Llorca-Meneses and codefendant Perez-Rives were each charged with one count of conspiracy to commit wire fraud, two counts of aiding and abetting aggravated identity theft, and two counts of aiding and abetting aggravated identity theft. Perez-Rives pled guilty, pursuant to a plea agreement, to one count of conspiracy to commit wire fraud and one count of aggravated identity theft, and the government dismissed the other charges

against him. Llorca-Meneses pled not guilty and proceeded to trial.

At trial, the government presented evidence that Llorca-Meneses and Perez-Rives embarked on two road trips across the southern United States in December 2017--the first with another couple and the second by themselves. Video evidence showed the vehicles they rented stopping at multiple gas stations where 'skimming devices' were planted. These skimming devices recorded credit- and debit-card information from customers who used the gas pump where the devices were placed. The devices then relayed that information to persons--Perez-Rives and allegedly Llorca-Meneses--with access to the devices, who then activated or re-encoded 'access devices' such as gift cards with the stolen information. Those access devices were then used as if they were the credit or debit cards scanned by the skimming devices. Video evidence and police testimony showed that Perez-Rives and several others, including Llorca-Meneses, stopped at a number of the impacted gas stations, and skimming devices

were found on the pumps they allegedly used. Although Perez-Rives and another unidentified male were on camera using an ATM at one of the gas stations, the video surveillance did not definitively show who used the impacted pumps. When Llorca-Meneses and Perez-Rives were apprehended, Perez-Rives was caught with 38 re-encoded cards on his person. Police found one re-encoded gift card, a gas pump key, and six thousand dollars in cash in Llorca-Meneses's purse, which was located either in the center console or at Perez-Rives's feet, and therefore accessible to both passengers.[1]

Llorca-Meneses's counsel's theory throughout trial was that Perez-Rives was the mastermind of the

_____

1. Llorca-Meneses was driving when she and Perez-Rives were pulled over. The government contended throughout trial that the purse was found in the center console, and therefore was in Llorca-Meneses's possession at the time she was arrested. *See* Tr. Transcript Jason Kolbe Testimony (doc. no. 148) at 13:21-15:2. According to Llorca-Meneses's testimony, when she and Perez-Rives were pulled over, her purse was at Perez-Rives's feet and out of her reach, rather than in the center console, because the design of the car made placing it anywhere else uncomfortable. *See* Tr. Transcript Eunices Llorca-Meneses Testimony (doc. no. 146) at 32:21-33:6.

conspiracy, and that Llorca-Meneses, while present, did not know what Perez-Rives was doing with the skimming devices. In particular, her defense counsel attempted to show that she and Perez-Rives had recently rekindled their romantic relationship from high school, and Perez-Rives convinced her to ride around the country with him without mention of his criminal scheme. Llorca-Meneses--according to her defense counsel--was naive and wanted to travel outside her home state of Florida for the first time; she agreed to the road trip but not the criminal conspiracy. The defense attempted to demonstrate that Llorca-Meneses lacked the sophistication to participate in the offense, pointing to the fact Llorca-Meneses immigrated to the United States from Cuba as an adult, speaks limited English, and has worked as a cleaner for the duration of her time in the United States.

In pursuit of this theory, Llorca-Meneses's defense counsel wanted to ask a testifying officer, Agent Frith, if he knew the outcome of Perez-Rives's case. During a

break while the jury was excused, defense counsel sought guidance from the court:

> "DEFENSE COUNSEL: I want to the get the Court's direction on this. On cross-examination, I don't want to step out of line. On cross-examination, I was planning on asking the investigator does he know the outcome of Mr. Perez's case. I think that's a proper question, Judge; but once again, I wanted to air that out.
>
> "THE COURT: Do you know the outcome of Mr. Perez['s] case?
>
> "AGENT FRITH: I know he pled guilty under—is what I've been told.
>
> "DEFENSE COUNSEL: That's all I was going to ask him, Judge, but I wanted to make sure that was appropriate.
>
> "THE COURT: Are you objecting to that question?
>
> "THE GOVERNMENT: No.
>
> "THE COURT: Very good."

Tr. Transcript Sterling Frith Testimony (doc. no. 90) at 31:4-17. When the jury returned, the following transpired:

> "DEFENSE COUNSEL: Now, in fact, her codefendant on this case was Mr. Rives; is that correct?
>
> "AGENT FRITH: Yes, sir.

**14**

"DEFENSE COUNSEL: He was charged with the exact same thing she was charged with; is that correct?

"AGENT FRITH: I'm not aware of what his charges were. I'm not even actually aware of what--specifics in Ms. Meneses's charges.

"DEFENSE COUNSEL: Okay. Are you aware that he came into federal court and pled guilty?

"AGENT FRITH: I am."

*Id.* at 62:5-14.

Up until this point in the trial, while the government had put forward a host of evidence showing Llorca-Meneses was present for the conspiracy, evidence tending to show that she joined in it was limited and not conclusive. Evidence of these elements was limited to the cash, the key, and the re-encoded gift card found in Llorca-Meneses's purse, and the government's strained attempt to show that Llorca-Meneses served as a distraction at one of the gas stations.[2]

_____

2. There is some reason to question whether the cash was evidence of Llorca-Meneses's participation in the conspiracy. The government assumed, as did seemingly everyone at the time of trial, that the cash was ill-gotten gains from the conspiracy. However, according to a psychological evaluation of Perez-Rives prior to

On redirect, the government sought to ask Agent Frith for additional details regarding Perez-Rives's guilty plea. Before continuing, the government conferred with defense counsel, who stated no objection. The government proceeded:

> "THE GOVERNMENT: Now, I placed in front of you a copy of the plea agreement that was actually filed in federal court for Mr. Rives. Do you see that in front of you?
>
> "AGENT FRITH: Yes, ma'am.
>
> "THE GOVERNMENT: And do you see which charges he pled guilty--
>
> "AGENT FRITH: Yes. Pleading pursuant to one and four.
>
> "THE GOVERNMENT: Okay. And what's one and four?
>
> "AGENT FRITH: Conspiracy to commit wire fraud, aggravated identity theft aiding and abetting. ...
>
> "THE GOVERNMENT: Does it say the factual basis?
>
> "AGENT FRITH: It does.

---

sentencing, the $ 6,000 cash seized was legitimate money he earned by selling his truck. *See* Psychiatric Evaluation (doc. no. 108-2). At Perez-Rives's sentencing, the $ 6,000 was not included in calculating the loss amount.

"THE GOVERNMENT: Can you read the first--I think it's the first two paragraphs. Let's do the first one paragraph. Make sure.

"AGENT FRITH: The defendant admits the allegations charged in count one of the indictment and understands that the nature of the charge to which the plea is offered involves proof as to count one of the indictment and to--indictment which is in violation of Title 18, United States Code 18, Section 1349. Specifically, the defendant admits the following to be true and correct."

. . .

"THE GOVERNMENT: Paragraph A on page number 4. Could you please read that into the record?

"AGENT FRITH: On page number 4?

"THE GOVERNMENT: Yeah. Same page, paragraph A, as in apple, under the factual basis.

"AGENT FRITH: Beginning on a date unknown and continuing to or on about December 21st, 2016, in the Middle District of Alabama and elsewhere, the defendant, Reiner Perez-Rives, did conspire with the codefendant and others to unlawfully commit wire fraud.

"THE GOVERNMENT: Okay. Thank you. No--we're not going to read anything further. You're aware there are only two defendants charged in this case; correct?

"AGENT FRITH: That is correct."

*Id.* at 66:1-67:16.

Thus, the jury heard testimony by Agent Frith that Perez-Rives--who they knew pleaded guilty--swore that he had conspired with Llorca-Meneses to commit the very crimes about which she claimed to be totally ignorant. Ordinarily, the court would not have allowed the admission of a non-testifying codefendant's hearsay statement inculpating the defendant, or would have at least provided, even sua sponte, a limiting charge to the jury about the permissible use of such substantially incriminating testimony if it had any permissible use.

After trial that day concluded, the court was deeply concerned about the propriety of Agent Frith's testimony and held an in-camera conference. During that conference, the court confirmed with the parties that the government showed Perez-Rives's plea agreement to defense counsel prior to asking Agent Frith about it, and asked defense counsel if he intentionally allowed the plea agreement to be introduced. Defense counsel responded, "Well, it's not that I wanted it or not wanted it"; and that, "in candor to the court, when I asked Mr. Frith

18

that, I was just asking if he knew that [Perez-Rives] had pled guilty." Tr. Transcript In-Camera Hearing (doc. no. 147) at 2:21-3:9.

On the last day of trial, Llorca-Meneses took the stand and testified that she did not understand how gift cards or debit cards work; that the gift card found in her purse was a gift to her from Perez-Rives; and that she did not know it should not work at locations other than the store designated on the card.  She further testified that her purse was on the floor of the car at Perez-Rives's feet while she was driving, and that she never put the money or the key in it.  When the police pulled them over and Llorca-Meneses needed her driver's license, Perez-Rives took her wallet out of her purse and handed it to her but kept the purse by him.  She did not see the money or the key until the police searched the purse and the vehicle and uncovered it.  Perez-Rives was never called as a witness, and therefore was not subject to cross-examination.  Neither party requested and the court did not provide a cautionary or otherwise limiting

instruction to the jury about Perez-Rives's guilty plea or the incriminating hearsay testimony read from the factual basis for the plea.  On September 8, 2017, the jury found Llorca-Meneses guilty on all five counts.

After a few days of reflection, the court remained disturbed about the introduction of Perez-Rives's plea agreement.  It held an in-camera hearing on September 12, 2017, and told the parties: "I had some very--I have to admit, some very serious concerns, the first being the most serious, where Mr. Perez's comment came in.  I'm not saying it warrants a new trial, but it's serious enough for me to bringing it to your attention."  Sept. 12 Hearing Transcript (doc. no. 145) at 4:22-5:1.  The court continued and clarified that its primary concern was about "the statement ... by the codefendant Perez that [Llorca-Meneses] was part of the conspiracy," *id.* at 9:6-7, and that it was worried because it was "a close case."  *Id.* at 14:11-12.  It acknowledged that it was not trying to blame either party, but rather that "maybe it was the court that committed the error," *id.* at 7:17-18,

and that, "My concern is I should not have allowed that" as it was an "instance[] where the court itself maybe should have stepped in and prevented that from happening." *Id.* at 4:4-7.

## V.   Discussion

As stated, before the court are two interest-of-justice motions for a new trial. One argues for a new trial due to the admission of the non-testifying codefendant's hearsay testimony inculpating Llorca-Meneses. The second argues newly discovered evidence--that is, a statement by the codefendant's lawyer that it was her impression that Perez-Rives thought Llorca-Meneses had nothing to do with the criminal activity--warrants a new trial. The court will take up each motion in turn.

### A. Perez-Rives's Hearsay Testimony

In her first motion for new trial, Llorca-Meneses argues that the "interest of justice" requires a new

trial because the government's introduction of testimony from her codefendant's plea agreement without her having an opportunity to cross-examine him unfairly prejudiced her.  To be sure, the government did not place the plea agreement itself into evidence; instead, the government asked Agent Frith to answer questions about the contents of the plea agreement for the jury, including (1) the specific counts to which Perez-Rives pled guilty and (2) hearsay statement by Perez-Rives regarding the factual basis for his plea, both of which inculpated Llorca-Meneses.  The court views the motion as challenging the placing of these pieces of evidence before the jury.

Because the hearsay statement by Perez-Rives about the factual basis for his plea (which it now finds to be inadmissible, inculpatory hearsay testimony in violation of the Confrontation Clause) should not have allowed as evidence, the court concludes this error unfairly prejudiced Llorca-Meneses.  Accordingly, the court will grant this motion and a new trial limited to this basis.

### 1. Legal Framework

The Sixth Amendment guarantees criminal defendants the right to confront and cross-examine adverse witnesses. *See* U.S. Const. Amend. VI. "The primary object of the constitutional provision ... was to prevent depositions or *ex parte* affidavits from being used against the prisoner in lieu of a personal examination and cross-examination of the witness." *Mattox v. United States*, 156 U.S. 237, 242–43 (1895). By requiring witnesses against the defendant to submit to cross-examination, "the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Id.* Indeed, "it is the confrontation clause of the sixth amendment that forms the criminal defendant's principal protection against the use, or

misuse, of incriminating extrajudicial statements," *United States v. Sarmiento-Perez*, 633 F.2d 1092, 1099 (5th Cir. Jan. 9, 1981), as it "ensure[s] that convictions will not be based on the charges of unseen and unknown--and hence unchallengeable--individuals." *Lee v. Illinois*, 476 U.S. 530, 541 (1986). In so doing, it is "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405 (1965).

The Confrontation Clause governs the admission of out-of-court testimonial statements offered to prove the truth of the matter asserted, while testimonial statements offered for other purposes and nontestimonial statements are governed by the rules of evidence. *Crawford v. Washington*, 541 U.S. 36, 59-61 (2004). After decades of conflict between the guarantees of the Confrontation Clause and the admissibility of out-of-court statements under the rules of evidence--particularly hearsay exceptions based on judicial findings of "reliability"--the Supreme Court

settled the issue in 2004, acknowledging, "we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" *Id.* at 61; *see id.* at 59 ("To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.") In *Crawford*, the Court held the Confrontation Clause requires testimonial statements of witnesses absent from trial, when offered for the truth of the matter asserted, to be admitted only where the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. *Id.* at 59. The Court defined testimonial statements as "ex parte in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine,

or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," as well as "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52. Statements that do not fall into these categories are "nontestimonial," and both testimonial statements offered for purposes other than establishing the truth of the matter asserted and nontestimonial statements are the province of hearsay law and the rules of evidence. *Id.* at 59-62.

Still, even prior to *Crawford* it was well-established that confessions or statements by accomplices implicating a defendant are inherently unreliable and violate the Confrontation Clause when admitted without an opportunity to cross-examine the declarant. *See Douglas v. State of Alabama*, 380 U.S. 415 (1965) (holding the inability to

cross-examine codefendant as to alleged confession denied the defendant his Sixth Amendment right); *Lee v. Illinois*, 476 U.S. 530 (1986) (holding "there is no occasion to depart from the time-honored teaching that a codefendant's confession inculpating the accused is inherently unreliable, and that convictions supported by such evidence violate the constitutional right of confrontation."); *Lilly v. Virginia*, 527 U.S. 116, 134 (1999) (holding "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule."); *United States v. Costa*, 31 F.3d 1073, 1078-79 (11th Cir. 1994) (holding the confession of a non-testifying, separately tried codefendant did not fall within the scope of a recognized exception to the hearsay rule). This is because codefendant or accomplice statements that incriminate defendants are "presumptively unreliable." *Lilly*, 527 U.S. at 131 ("It is clear that our cases consistently have viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling

outside the realm of those hearsay exceptions that are so trustworthy that adversarial testing can be expected to add little to the statements' reliability.") (internal quotations and citations omitted). Indeed, "[a]s the Supreme Court has consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." *Costa*, 31 F.3d at 1078 (11th Cir. 1994). This presumed unreliability makes cross-examination necessary: "the unreliability of such evidence is intolerably compounded when the alleged accomplice ... does not testify and cannot be tested by cross-examination." *Bruton v. United States*, 391 U.S. 123, 136 (1968).

For similar reasons, "[w]ith respect to a codefendant's guilty plea, the general rule is one of non-disclosure." *United States v. Johnston*, 620 F. App'x

839, 845 (11th Cir. 2015)(unreported).  This is because, "in most occasions, the admission of a co-defendant's guilty plea will substantially affect the defendant's right to a fair trial in that 'the jury may regard the issue of the remaining defendant's guilt as settled and that the trial is a mere formality.'" *United States v. De La Vega*, 913 F.2d 861, 866 (11th Cir. 1990) (citing *United States v. McLain*, 823 F.2d 1457, 1465 (11th Cir. 1987)).  Because a codefendant's guilty plea may incriminate the defendant by implication, the Eleventh Circuit has instructed that, "when a jury learns of a codefendant's guilty plea, the trial judge should immediately admonish them against transferring the guilt of one to another." *United States v. DeLucca*, 630 F.2d 294, 298 (5th Cir. 1980).  "[A] cautionary instruction is generally sufficient to dispel any prejudice that arises from informing the jury of a codefendant's plea of guilty." *Id.*  However, "there may be aggravated circumstances in which the strongest corrective instruction would be insufficient, as, for example, where

the guilty plea of one codefendant necessarily implicates another or others." *United States v. Baete*, 414 F.2d 782, 783 (5th Cir. 1969).

Nonetheless, unlike incriminating testimonial statements by a codefendant not subject to cross-examination, there are some circumstances where a codefendant's guilty plea may be admitted to serve a legitimate purpose, and admissibility under those circumstances is governed by Federal Rule of Evidence 403. *See United States v. Griffin*, 778 F.2d 707, 709 (11th Cir. 1985); *see also United States v. McLain*, 823 F.2d 1457, 1465 (11th Cir. 1987)("The traditional standard for admission of a co-defendant's guilty plea comes under Fed. R. Evid. 403 ....").  Rule 403 provides that a trial judge should exclude relevant evidence where its probative value is substantially outweighed by unfair prejudice, and there are some instances where the guilty plea may be relevant and not necessarily unduly prejudicial: for example, a guilty plea may be admitted to either bolster or discredit a codefendant when that

codefendant testifies.  *See United States v. King*, 505 F.2d 602 (5th Cir. 1974); *United States v. DeLoach*, 34 F.3d 1001, 1003 (11th Cir. 1994).  A guilty plea may also be disclosed to the jury when a codefendant pleads guilty during the course of the trial and disclosure is necessary to explain his or her sudden absence from the defense table.  *See Griffin*, 778 F.2d at 710 n.5.[3]

Nevertheless, even where there is a legitimate purpose for the introduction of the guilty plea, the jury should be instructed about the limited use it may make of the evidence, and under no circumstances may a codefendant's guilty plea be used as substantive evidence against the accused.  *See King*, 505 F.2d at 607 ("A co-defendant's guilty plea or conviction may be brought out at trial provided that 1) the evidence serves a legitimate purpose and 2) the jury is properly instructed

_____

3. Still, in these instances, the better practice would be for the trial judge simply to tell the jury that the codefendant has been excused from trial for legally sufficient reasons that should have no bearing on the remaining defendant's guilt or innocence, rather than disclosing the plea.  *See Griffin*, 778 F.2d at 710 n.5.

about the limited use they make of it."); *McLain*, 823 F.2d at 1465 (11th Cir. 1987) ("A co-defendant's guilty plea may not be used as substantive evidence of the defendant's guilt.").

## 2. Application

In this case, the jury heard both that the codefendant pleaded guilty and hearsay testimony from the codefendant expressly saying Llorca-Meneses conspired with him to commit the crime. Codefendant Perez-Rives did not testify, and Llorca-Meneses did not have a prior opportunity to cross-examine him. The court did not issue any curative instructions to the jury. Llorca-Meneses contends these events unfairly prejudiced her and deprived her of her right to a fair trial. The government argues any error was invited and therefore waived because defense counsel solicited the testimony about the guilty plea and did not object to the introduction of Perez-Rives's statement in the plea agreement. The court now takes up each issue in turn.

### i. The Guilty Plea

For the above reasons, the court agrees with Lloca-Meneses that guilty pleas by codefendants are, in general, admissible only after a proper application of the Rule 403 balancing test. Here, prior to the introduction of Perez-Rives's guilty plea, defense counsel sought guidance from the court as to its admissibility purportedly to show Perez-Rives's culpability, and rather than engaging in the Rule 403 balancing test, the court merely asked the government if it was going to raise an objection. When the government did not object, the court reasonably assumed that both sides agreed that Rule 403 balance was struck in favor of admissibility.

Moreover, Lloca-Meneses's counsel himself sought introduction of evidence that Perez-Lopez had pled guilty. If there was error in the admission of the plea here, it was unequivocally invited, and, under the doctrine of invited error, when a defendant puts on

otherwise inadmissible evidence, he may not later obtain relief for its admission. *See United States v. Jernigan*, 341 F.3d 1273, 1290 (11th Cir. 2003) (finding that a defendant in a joint trial, whose counsel affirmatively stipulated to admission of codefendant's hearsay statements, "may not make an affirmative, apparently strategic decision at trial and then complain on appeal that the result of that decision constitutes reversible error."); *United States v. Carranza*, 921 F.2d 1557, 1568 (11th Cir. 1991) (holding that, "because [the defendant] caused the evidence of the co-defendant's guilty plea to be presented as a tactical trial decision, he waives any claim of error on appeal."); *United States v. Chilcote*, 724 F.2d 1498, 1503 (11th Cir. 1984) (holding that a defendant's failure to object to the introduction of the guilty plea or request a limiting instruction at trial, as well as his later reliance on the guilty plea in closing argument, combined with other factors, precluded relief); *see also United States v. Martinez*, 604 F.2d 361, 366 (5th Cir. 1979) ("The accepted rule is that

where the injection of allegedly inadmissible evidence is attributable to the action of the defense, its introduction does not constitute reversible error.") (internal quotations omitted).

To be sure, on re-direct the government inquired further to clarify which specific counts Perez-Lopez had plead guilty to, but, defense having opened up this area of arguably inadmissible inquiry, this was a reasonable extension of that inquiry. *See United States v. Vinales*, 658 Fed. Appx. 511, 524 (11th Cir. 2016) (unreported) (holding that there was no reversible error where the defendant relied on the guilty pleas of codefendants throughout trial and the prosecutor introduced officer testimony regarding the charges to which the codefendants pled, noting that a prosecutor is not required to "fight with one hand while his opponents fight with two--he may make a 'fair response' to the defendant's arguments."); *United States v. Edwards*, 716 F.2d 822, 825 (11th Cir. 1983) (holding that where the defendant implied the codefendant had something to gain from testifying during

cross, he established the relevancy of codefendant's guilty plea, and "[t]he district court did not err in allowing the Government to rebut the inference of [the codefendant's] bias by informing the jury that [the codefendant] had already been convicted and sentenced before trial"); *see also*, *e.g.*, *United States v. Beason*, 220 F.3d 964 (8th Cir. 2000) (noting "the use of otherwise inadmissible evidence to clarify or rebut an issue opened up by defense counsel on cross-examination" is permissible).


ii.  Factual Statement in the Plea Agreement

However, the court reaches a much different conclusion with regard to Agent Frith's reading of Perez-Lopez's factual statement from the plea agreement in which, as presented at trial, he essentially expressly states that Lloca-Meneses was his accomplice.

Under *Crawford*, where there is (1) a testimonial statement, (2) offered to show the truth of the matter asserted, (3) by a witnesses absent from trial, it may

be admitted only where (a) the declarant is unavailable, and (b) the defendant has had prior opportunity to cross examine the declarant.  These conditions were not met before Perez-Rives's statement was presented to the jury.

The latter *Crawford* requirements are straightforward: Perez-Rives was absent from trial; no showing was made that he was unavailable; and Llorca-Meneses did not have a prior opportunity to cross-examine him.

With regard to first element, it is clear Perez-Rives's factual statement from the plea agreement is testimonial under *Crawford.*  Testimony "is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").  The statement in question came from Perez-Rives's plea agreement, and began with Agent Frith reading the portion in which Perez-Rives stated he

37

"admits the following to be true and correct." Tr. Transcript Sterling Frith Testimony (doc. no. 90) at 66:24; *see also* Plea Agreement (doc. no. 47) at 4. The plea agreement contains an acknowledgement that it was "being submitted to the Court," and is followed by an attestation by Perez-Rives that provides, "I swear under penalty of perjury that the facts in the 'factual basis' paragraph above are true and correct," and his signature. Plea Agreement (doc. no. 47) at 2, 12. The plea agreement was therefore, undoubtedly, "a solemn declaration or affirmation made for the purpose of establishing or proving some fact," those facts being those underlying Perez-Rives's conviction and his acknowledgement of his obligations under the agreement. *Crawford*, 541 U.S. at 51. Thus, the plea agreement, which was made in the presence of government counsel and law enforcement, submitted to the court for its use in future court proceedings, and contains an attestation by Perez-Rives taking ownership and verifying the truth of the representations made therein, is obviously testimonial:

it is a "statement[] that declarants would reasonably expect to be used prosecutorially," and it is in no way similar to "a casual remark to an acquaintance." *Id.*

Finally, the court cannot find that the hearsay factual testimony was presented for some purpose other than to prove the truth of the matter asserted. The inculpatory statement from the plea agreement was not relevant to Agent Frith's testimony at all: he did not offer the testimony to explain any investigative work, and although he was aware Perez-Rives pled guilty, he lacked any additional knowledge of Perez-Rives's case. *See United States v. Vital*, 531 F. App'x 950, 952 (11th Cir. 2013) (unreported) (noting that "the Clause may not preclude a statement by an out of court witness to law enforcement officials if it is not offered for its truth and, instead, is offered because it is "relevant to explain the course of the officials' subsequent investigative actions."). Tr. Transcript Sterling Frith Testimony (doc. no. 90) at 62:10-11. Because Perez-Rives did not testify, it is clear they were not offered either

to bolster or impeach his credibility. Rather, the testimony had one purpose, and one purpose alone: to show that, according to Perez-Rives, Lloca-Meneses was his accomplice.

Because the out-of-court, testimonial statement was offered to show the truth of the matter asserted, without any showing that Perez-Rives was unavailable and without Llorca-Meneses having a prior opportunity to cross-examine him, the introduction of the statement violated the Confrontation Clause.

The government responds, as with the admission of the plea agreement, that Llorca-Meneses invited any error with regard to the admission of the factual statement from the plea agreement and that the statement was properly introduced under the doctrine of fair reply. It argues that defense counsel opened the door to the plea agreement when he solicited testimony about the guilty plea. The government's questions about the plea agreement, it argues, were legitimate as rebuttal. Moreover, the government showed defense counsel the plea

agreement prior to introducing it, and he did not raise an objection.  The government, therefore, argues that defense counsel cannot now complain of an error he caused.

As stated, as a general rule and subject to Rule 403, inadmissible evidence is admissible on re-direct as rebuttal evidence where defense counsel opens the door to such evidence on cross-examination.

There is no question that defense counsel introduced the codefendant's guilty plea because he asked Agent Frith about it.  Further, once the guilty plea had been introduced, the government reasonably sought to correct a misrepresentation created by defense counsel on cross. In particular, during cross, defense counsel asked Agent Frith whether he knew there was a codefendant, that the codefendant "was charged with the exact same thing [Llorca-Meneses] was charged with," and whether Agent Frith was "aware that [Perez-Rives] came into federal court and pled guilty."  Tr. Transcript Sterling Frith Testimony (doc. no. 90) at 62:5-14.  Those questions may

**41**

have implied that Perez-Rives pled guilty to all five counts in the indictment. Thus, it was not unreasonable for the government to clarify on re-direct that Perez-Rives pleaded guilty to only counts one and four.

However, the additional questions the government asked to demonstrate that Perez-Rives had himself testified that Llorca-Meneses was guilty were not permissible re-direct under the doctrine of fair reply or otherwise because they did not reasonably rebut anything brought out on cross. There was, simply put, no legitimate rebuttal purpose for asking Agent Frith to read the factual basis for the plea--that is, "the defendant, Reiner Perez-Rives, did conspire with the codefendant and others to unlawfully commit wire fraud"--and then asking him to confirm that "there are only two defendants charged in this case." Tr. Transcript Sterling Frith Testimony (doc. no. 90) at 67:8-16. Llorca-Meneses did not open the door to these questions by eliciting testimony about the guilty plea as these additional questions were not directed towards

correcting or rebutting any misimpression left by the cross-examination. On the contrary, the only possible purpose behind those questions was to present, through Perez-Rives, direct evidence to the jury of Llorca-Meneses's guilt--a clearly impermissible purpose. Bringing in this statement introduced extremely unfairly prejudicial evidence and violated Llorca-Meneses's right of confrontation. *See Griffin*, 778 F.2d at 710) (finding that where evidence is "dragged in by the heels for the sake of its prejudicial effect," it should not have been admitted under Rule 403). Plus, the last question by the government, which clarified that Perez-Rives's statement expressly implicated Llorca-Meneses, made absolutely clear that Perez-Rives had said Llorca-Meneses was guilty, and it is well-established that "specific testimony that 'the defendant helped me commit the crime' is ... difficult to thrust out of mind." *Richardson v. Marsh*, 481 U.S. 200, 208 (1987), and thus is powerfully incriminating.

Even if Perez-Rives's statement in his plea agreement had had some marginal rebuttal value, its probative value was substantially outweighed by unfair prejudice. Llorca-Meneses had not opened herself up to evidence so severely and unfairly prejudicial. While Perez-Rives's guilty plea could be viewed as implicating Llorca-Meneses, it did not necessarily. Perez-Rives's statement in the plea agreement, in contrast, was clear and unequivocal evidence of her guilt. *Cf. United States v. Schwartz,* 541 F.3d 1331, 1353 (11th Cir. 2008) (finding a Confrontation Clause violation mandating reversal where the admitted hearsay implicated the defendant, saying: "[i]f the affidavit was insufficient to compel an inference of guilt based on the trial testimony alone, the inference was made inevitable--and therefore 'devastating'--when the prosecutor expressly made that connection for the jury in his closing argument."). Such testimony--in addition to being inherently suspect due to accomplice's desires to shift blame--is "powerfully incriminating," which is why it

44

must be subject to the rigors of cross-examination. *Richardson*, 481 U.S. at 208.

Moreover, the admission of the powerfully inculpatory hearsay uniquely undermined Llorca-Meneses's ability to present her defense and was not harmless: It undercut her principal, if not sole, defense--ignorance--by presenting testimony from her codefendant that she in fact conspired with him to commit wire fraud. It also severely compromised the credibility of her testimony--which followed the admission of the codefendant's statement and was the only testimony presented in her defense--that she was unaware of any criminal activity, because the jury had already heard otherwise from the codefendant. The court observed her at trial, and, from that observation, finds that, absent evidence of the factual statement, it highly probable that a reasonable jury would have concluded that she was

an innocent bystander or, at least, that there was reasonable doubt that she was otherwise.[4]

Thus, the court concludes that the admission of the statement from the plea agreement was extremely unfairly prejudicial and warrants a new trial. Although defense counsel should have objected to the inculpatory hearsay, the magnitude of the unfair prejudice still warrants a new trial. The introduction of it amounted to highly prejudicial 'plain error.'

Moreover, the court is convinced that it itself contributed, in part, to the erroneous admission of the statement. Rather than leaning over to the opposing counsel's table and quietly asking for a routine 'no objection to admissibility of evidence' understanding,

_____

4. As stated, there is also some reason to question whether the cash was evidence of Llorca-Meneses's participation in the conspiracy. According to a psychological evaluation of Perez-Rives prior to sentencing, the $ 6,000 cash seized was legitimate money he earned by selling his truck. *See* Psychiatric Evaluation (doc. no. 108-2). Indeed, at Perez-Rives's sentencing, the $ 6,000 was not included in calculating the loss amount.

defense counsel, instead, took the additional and special step of asking for an on-the-record in camera hearing; more was clearly at stake here.  He then announced that he wanted "the Court's direction" with regard to his posing the question to the witness about whether the codefendant had pled guilty.  Tr. Transcript Sterling Frith Testimony (doc. no. 90) at 31:4-17.  He said he was seeking the court's own advice on whether the question was "proper" and "appropriate."  *Id.*  He said he "wanted to air that out."  *Id.*  Therefore, his inquiry was, to the court, broad and general.  The government simply answered that it did not object to the question, and, despite the broad nature of defense counsel's request, including for an "airing" of the issue, in no way suggested that the admission of the question would, or even might, also lead to admission of the co-defendant's factual statement that Lloca-Meneses was, in fact, an accomplice.

The court would not have unconditionally ruled, in the face of defense counsel's broad inquiry, that the

posing of the initial question was "proper" and "appropriate" if it had known the ruling was going to lead to the admission of such highly unfairly prejudicial and inadmissible evidence as the factual statement in the plea agreement--at least, absent some affirmative representation, in the camera proceeding, that there was some reasonable basis for the admission of such additional evidence as well.  In face of the defense's in camera broad request for guidance, the court should have inquired as to where the evidence would lead, or the government should have been forthcoming as to such.  If the court had known such, and applied Rule 403 as required, it would have most certainly found that the probative value of the evidence, *if* it included the factual statement, was substantially outweighed by unfair prejudice.  The court would have found that the question was not "proper" and "appropriate" in light of all the circumstances or, in the alternative, would have limited the evidence admitted in response.  Moreover, when it became clear that the government intended to introduce

the factual statement, the court should have stepped in and made clear that its ruling did not include this highly prejudicial additional evidence or, at the very least, should have re-examined the reasonableness of its initial ruling (made in responses to defenses counsel's request for an in camera "airing" of the issue) and, if appropriate and effective, have taken curative steps.

There is the still the question of why defense counsel did not object to the admission of the factual statement. That is unclear.[5] It may have been that the admission was viewed as a reasonable extension of the court's in camera ruling, which would have been inaccurate. Or defense counsel may have simply acted unwisely in the heat of the events that quickly followed in wake of the court's ruling in open court. Nevertheless, the court is firmly convinced that its

---

[5]. Indeed, because the admission of the factual statement was so clearly and egregiously unfairly prejudicial to Llorca-Meneses, the specter of 'ineffective assistance of counsel' hangs in the air. But the court need not go there in light of its conclusion so far.

ruling was a factor in, or at least an unfortunate shadow overhanging, the later prejudicial admission of the factual statement. And the only way to allay this concern with certainty is for the court, in its discretion, and in light of the very special circumstances presented, to grant Llorca-Meneses a new trial.

While a defendant is not entitled to a "perfect trial," she is entitled to a "fair one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953). Llorca-Meneses's trial was grossly unfair due to the admission of the factual statement in the plea agreement. As the court noted immediately after trial, this was a close case, and allowing the jury to hear Perez-Rives's "powerfully incriminating" statement that Llorca-Meneses conspired with him to commit the crime as substantive evidence against Llorca-Meneses unfairly undermined her defense. There is a substantial probability the jury relied on the inadmissible statements in coming to its guilty verdict.

## B. Newly Discovered Evidence

The second motion seeks a new trial based on alleged newly discovered evidence. In order for this motion to survive, Llorca-Meneses would have to show that the evidence was discovered following the trial; she exercised due diligence to discover the evidence; the evidence is not merely cumulative or impeaching; the evidence is material to issues before the court; *and* that the evidence is of such a nature that a new trial would probably produce a new result. *United States v. Taohim*, 817 F.3d 1215, 1223 (11th Cir. 2013).

In support of her motion, Llorca-Meneses presents a statement by the codefendant's lawyer that it was that lawyer's impression that Perez-Rives thought Llorca-Meneses had nothing to do with the criminal activity. This statement was disclosed to Llorca-Meneses by the government. In the letter from the government to Llorca-Meneses, the government describes a conversation between Secret Service Agent Marcus Shumack, the Assistant United States Attorney, and Perez-Rives's

attorney wherein Perez-Rives's attorney said either: "He (Perez-Rives) thinks that she (Llorca-Meneses) did not know what was going on," where "going on" referred to the gas pump scheme in the case; or "I don't think that he (Perez-Rives) believes she (Llorca-Meneses) knew what was going on."[6]  Amended Motion for New Trial (doc. no. 120-1).  Perez-Rives was not present for this conversation.  The letter further describes a follow-up conversation the government lawyer held with Perez-Rives's attorney, where Perez-Rives's attorney stated that Perez-Rives never explicitly stated anything about Llorca-Meneses's culpability, rather this was her impression based on her conversations with him and her review of the evidence.

Llorca-Meneses argues this evidence warrants a new trial.  She argues that the evidence would have a material effect on her case and cause a different outcome because

---

6.  The first account was the government lawyer's recollection of the conversation, the second account was Agent Shumack's recollection.

"such evidence directly contradicts the intent element of [her] conviction." Amended Motion for New Trial (doc. no. 120) at 1. To show that she exercised due diligence and could not have discovered the evidence prior to trial, she asserts that she "could not have obtained this evidence prior to conviction because a co-defendant protected it through attorney-client privilege," *id.,* and "Counsel for Llorca-Meneses would have to have circumvented the confidential nature of attorney-client privilege in order to obtain communications discussed in the Department of Justice letter." *Id.* at 3.

The government argues Llorca-Meneses has not satisfied her burden to show the alleged newly discovered evidence would be admissible at trial as required for the motion to survive. As explained previously, newly discovered evidence does not include evidence that would be inadmissible at trial. Here, the putative evidence is, at most, the opinion of the codefendant's lawyer and, second, is not based on any explicit statement about Llorca-Meneses from the codefendant.

These conversations were, as Llorca-Meneses acknowledges, protected by attorney-client privilege at the time they took place, and this privilege can be waived only by the client, intentionally. *See* Fed. R. Evid. 502(a)-(b). However, Llorca-Meneses does not address why the attorney-client privilege no longer remains a barrier to presenting the alleged new evidence should she receive a new trial. Llorca-Meneses has not alleged that Perez-Rives waived privilege or that the statements are no longer protected by attorney-client privilege.

But more importantly, even if the impressions of Perez-Rives's lawyer based on conversations with him are not privileged, Llorca-Meneses has not argued, less shown, that they are otherwise admissible. The lawyer's statement is not only pure speculative opinion (that is, not in any way factual), it is also impermissible hearsay.

The defendant carries the burden to satisfy each element of the five-prong test, and Llorca-Meneses has not argued any means by which the putative evidence would

be admissible in court. The evidence, being inadmissible, would not produce a different result at trial. Accordingly, this motion will be denied.

***

Accordingly, it is ORDERED that defendant Eunices Llorca-Meneses's first motion for a new trial (doc. no. 88) is granted, and her second motion for new trial (doc. no. 120) is denied.

DONE, this the 13th day of November, 2018.

<u>/s/ Myron H. Thompson</u>
UNITED STATES DISTRICT JUDGE